KOURI et al. v. KELTON et al.

No. 14604.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 21, 1944.

Rehearing Denied March 10, 1944.

Houston McMurry, of Henrietta, and Davenport & Dickson, of Wichita Falls, for appellants.

Mathis & Caldwell, Bullington, Humphrey & Humphrey, Frank Ikard, and W. B. Chauncey, all of Wichita Falls, for appellees.

BROWN, Justice.

This is a very much involved lawsuit over a tract of about 200 acres of land in Clay County, and has arisen between a large number of persons who are claiming as heirs and descendants of those who could claim some interest from the old forbear, who is the common source of title, namely, William Wells.

From the record we gather that the first settlers on this unimproved land were P. E. Elliott and wife, Georgia, who moved upon it in 1903. These people had a number of children, and among them were three sons, O. W., C. A. and J. H. Elliott.

About the year 1909, Elias Kelton, his wife, Eliza, and their children moved on the place.

Mrs. P. E. Elliott died in 1914, and was survived by her husband, four sons (including O. W. Elliott) and one daughter.

P. E. Elliott and all of his children left the place and none has lived on it or attempted to live on it since 1916, but Eliza Kelton, widow of Elias Kelton, and her children remained on the place and have lived thereon ever since.

Of all of the persons connected with this suit, who are claiming to be or are named as descendants and heirs of William Wells, O. W. Elliott is the only person who has been near the premises or taken any interest whatever in the place, or shown any disposition to claim any right or interest therein, and the visit that he made to the place and the Kelton home in 1937 and his conduct then will be discussed later.

The widow Kelton and her children have had exclusive possession and control of the premises since the year 1930, and they have rendered it for taxes and paid the taxes thereon every year.

Elias Kelton died in 1930, and he, his wife and their children have had exclusive possession and control of the premises from the year 1916 to 1930, and they have rendered it for taxes and paid the taxes thereon each year.

The Keltons have made valuable improvements on the place and have kept up the fences and improvements during these many years of occupancy.

On February 13, 1940, Fred J. Kelton and his brother, Alton B. Kelton, and his mother, the widow Eliza Kelton, brought suit in trespass to try title against a large number of defendants and their heirs and the unknown heirs of such, and set forth the residences of many of them, and alleged that the residences of many were unknown, and had citation by publication issued for those whose residences were unknown.

The cause was placed in the hands of a well known firm of lawyers, one of whom, as attorney for the plaintiff, made oath to the petition.

We may safely say that the petition thus filed affects every person adversely interested in the lands and claiming any interest therein adverse to the said Keltons, the plaintiffs in the suit.

The Keltons obtained judgment for title to and possession of the land in controversy in June, 1940.

J. A. Thomason, Bettie H. Thomason, a widow, the surviving spouse of G. W. Thomason, deceased, and G. J. Thomason brought suit in the district court of Clay County against the three named Keltons, alleging that the defendants brought suit against "Dave Derbery et al" to remove cloud from the title to the land in controversy "and that all of the defendants including G. W. Thomason, the deceased husband of Bettie H. Thomason, were cited by publication, and that on the 21st day of June, A.D. 1940, judgment was rendered in favor of Fred J. Kelton et al, who are the defendants in this suit, removing cloud from said title".

They then allege that J. A. and G. J. Thomason are the children of N. A. Thomason and Z. B. Thomason, deceased, "who were two of the defendants" in the suit filed by the Keltons; that they "are interested in the subject matter of the land in question as the heirs of N. A. Thomason

and Z. B. Thomason, deceased, and that two of the plaintiffs, J. A. Thomason and G. J. Thomason, were not cited either in person or by citation by publication, and that the plaintiffs in said cause * * * knew the whereabouts of G. W. Thomason in Dallas, Texas, and G. J. Thomason in Wichita County, Texas, and J. A. Thomason in Smith County, Texas, and knew that they owned an interest in the land".

We observe here that Bettie H. Thomason testified that her husband, G. W. Thomason, died in 1913.

These plaintiffs alleged the "Keltons, in order to commit a fraud upon them, cited them by publication".

They alleged that they knew nothing of the suit filed by the Keltons until just before they filed their suit, and they prayed that the judgment obtained by the Keltons be set aside and that they "be adjudged to be the owners of an interest in the above described land".

Following the filing of the Thomason suit, O. W. Elliott and others filed a petition in intervention, alleging that they have a like interest in having the Kelton judgment set aside; that they are the descendants and heirs of Georgia Elliott and P. E. Elliott, and the only heirs and descendants of Henry Kelton, deceased, respectively; that they had no actual notice of the Kelton suit, but were merely served by publication, and they pray that the Kelton judgment be set aside and that the land be partitioned and that they "are willing to accept their portion of said land that may be allotted to them under a partition decree", and that they have a meritorious defense to the Kelton suit.

Petition of intervention was filed by Andrew J. Wells and some thirty-four (34) other persons, naming J. A., G. J. and Bettie H. Thomason, O. W., C. A. and J. H. Elliott as defendants, as well as the three Keltons.

They allege that "they have an interest in the subject matter in controversy" and "have a cause of action against the parties thereto".

All of these persons allege that they are the descendants and heirs of sons and daughters of William Wells, Jr., who was a son of William Wells, the original patentee of the lands in controversy. That to prevent them from making a defense to the Kelton suit, they were cited only by publication; that they can establish the fact that they are co-tenants with the Kel-

tons and "owners of certain interests in the land in controversy".

They ask that they be permitted to bring their suit as a class suit for all of the parties named by them; and they pray for "judgment against defendants for their respective interests in the land in controversy".

Berta S. Chambless and some twenty-five (25) other persons intervened individually "and as representatives of and for the benefit of any and all other heirs of T. C. Swann, deceased", and they name the Keltons as defendants.

They allege that they own an undivided one-fourth (¼) interest in the lands in controversy; that they are all heirs of T. C. Swann, deceased, and they pray for title to and possession of the lands and for rents.

To all of these pleadings the Keltons made appropriate answers and cross-actions, praying for judgment against all of them for title to and possession of the lands in controversy, and specially pleaded their title by limitation.

The cause being tried to a jury, in answer to the issues submitted the jury found: (1) That Elias Kelton, during his lifetime, and his wife and the two above named sons, have held peaceable, continuous and adverse possession of the land in question, cultivating, using and enjoying the same and holding the same under fence, and claiming all of the land in question for a continuous period of ten years prior to January 1, 1940; (2) that the "T. C. Swann Heirs group" knew, or by the exercise of ordinary care and diligence could have known for a full period of ten years prior to January 1, 1940, that Elias Kelton, while he lived, and Fred J. Kelton, Alton B. Kelton and Eliza Kelton were claiming all of said land as their own; and the same findings were made (3) as to the "Margaret Wells Whitter group", (4) the "Nancy Thomason Heirs group", (5) the "Georgia Elliott Heirs group", and (6) the "Henry Kelton Heirs group"; (7) that the "T. C. Swann Heirs group have had knowledge of sufficient facts, which if pursued, would have led an ordinarily prudent person to know that Elias Kelton, while he lived, and Alton B. Kelton, Fred Kelton and Eliza Kelton were claiming the land involved in this suit as their own"; like findings were made (8) as to the "Margaret Wells Whitter group", (9) the "Nancy Thomason group", (10)

the "Georgia Elliott group", and (11) the "Henry Kelton group"; (12) that Elias Kelton, while he lived, Fred J. Kelton, Alton B. Kelton and Eliza Kelton have held peaceable, continuous and adverse possession of the land in question, cultivating, using or enjoying the same, and holding the same under fence and claiming all of said land in question for a continuous period of ten years prior to September 28, 1937, as against O. W. Elliott; and (14) that Elias Kelton, from 1916 up and until the time of his death (which was in 1930), has had peaceable, adverse and continuous possession of the land in question, holding same and claiming it as against all of the parties to the suit other than his wife and said two sons.

All of the parties who made claims as against the three Keltons were denied recovery and on their cross-actions the Keltons were given judgment against all of the parties litigant for title to and possession of the land.

We find a motion for a new trial presented by John Marion Whitter, H. L. Whitter and Gussie M. Whitter, reciting "each for himself and in behalf and as representatives of the heirs of William Wells, deceased", and by J. A. Thomason, Bettie H. Thomason and G. J. Thomason, "each for himself and as representatives and in behalf of the heirs of Nancy A. Thomason, deceased, except Mary Thomason, Ruby S. Thomason, Faye Thomason, and Winnye McCallum", and by Berta S. Chambless, Maggie Muston, Fannie Riley, Ruth Hendley, Sam Harrison, Mary Frizzell, A. R. Thornton, W. H. Chambless, Hasseltine C. Gibson, Lawson Chambless, Mack Chambless, B. M. Swann, Anna S. Chambless, Johnnie Swann, T. S. Shank, H. M. Shank, Paul J. Shank, Anna Mary Hitt, Mary G. Williamson and May C. Wilson, "each for himself and as representatives of and for the benefit of any and all heirs of T. C. Swann, deceased"; and by O. W. Elliott, C. A. Elliott, J. H. Elliott, Mrs. Ottie Stephenson, Robert Kelton and Ibey Derbery.

We are of opinion that this motion is presented only by the parties actually named therein and that the added words attempting to make the motion apply to and be in behalf of "the heirs of William Wells, deceased", not named, and "the heirs of Nancy A. Thomason, deceased", not named, and "the heirs of T. C. Swann, deceased", not named, is mere surplusage and does not and cannot serve as a motion for a new trial by any person or persons other than those actually named.

This brings us to the appeal bond, which was executed by one of the attorneys of record for a large number of the litigants, and is a bond for costs.

The attorney for the following parties signed their names to the cost bond on appeal: S. S. Kouri, John Marion Whitter, H. L. Whitter, Gussie M. Whitter, Berta S. Chambless, Maggie Muston, Fannie Riley, Ruth Hendley, Sam Harrison, Mary Frizzell, A. R. Thornton, W. H. Chambless, Hasseltine C. Gibson, Lawson Chambless, Mack Chambless, B. M. Swann, Anna S. Chambless, Johnnie Swann, T. S. Shank, H. M. Shank, Paul G. Shank, Annie Mary Hitt, Mary G. Williamson, Mary C. Wilson, J. A. Thomason, Bettie H. Thomason, G. J. Thomason, O. W. Elliott, C. A. Elliott, J. H. Elliott, Mrs. J. D. Stephenson, Robert Kelton, and Ivy Derbery.

A petition in intervention was filed by Andrew J. Wells, Marion F. Wells, J. A. Wells, Belle Wells, Ella Wells Free, joined by her husband L. J. Free, Wilson S. Hicks and wife, Ora Anna Hicks, J. J. Wells, L. R. Wells, Oscar W. Wells, Horace H. Wells, Pearl Almer Wells, William J. Morris, Albert C. Morris, Josie Fleming, joined by her husband Marlin Fleming, Fannie Hicks, joined by her husband A. Zack Hicks, Amy Della Wood, joined by her husband Rufus F. Wood, J. Wilburn McDowell, Henry T. McDowell, Hasseltine McDowell, Ethel Pierce, joined by her husband J. Riley Pierce, Lovie Dowell Curry, joined by her husband Artie L. Curry, B. L. McDowell, Ella Wells Garner, joined by her husband George E. Garner, John Marion Whitter, H. L. Whitter and Gussie M. Whitter, and the petition recites that leave of court is had for its filing and it complains of "J. A. Thomason, G. J. Thomason, Bettie H. Thomason, O. W. Elliott, C. A. Elliott, J. H. Elliott, Fred J. Kelton, Alton B. Kelton and Eliza B. Kelton.

The petition sets forth the forbears of the respective parties and avers that they are descendants and heirs of William Wells and of the wife of William Wells, to-wit, Nancy Kelton Wells, the second wife of said William Wells.

They allege that they own and are entitled to "certain interests in the lands in controversy", and they pray for permission to intervene and that cause "No.

6350 entitled Fred J. Kelton et al vs. S. S. Kouri et al be consolidated with this suit, that they have judgment against defendants for their respective interests in the land in controversy".

Even a casual reading of the appeal bond discloses that many of these intervenors who are of necessity parties adversely interested as against all other interveners and plaintiffs who are seeking relief against the three Keltons named above—the persons in actual possession of the land in controversy—not only did not join in the motion for a new trial but are not made parties to the appeal bond either as obligors or obligees.

The petition in intervention shows by its wording that the parties thereto are asking to intervene in cause No. 6601, in which J. A. Thomason, Bettie H. Thomason and G. J. Thomason are plaintiffs, and Fred J. Kelton, Alton B. Kelton and Eliza B. Kelton are the named defendants, and which cause presents a bill of review as against the named defendants.

In this bill of review suit O. W. Elliott, C. A. Elliott, J. H. Elliott, Ottie Stevenson, Dave Derbery, Ivy Derbery and Robert Kelton had theretofore intervened, and this accounts for the Wells heirs naming the said Thomasons and the said Elliotts as defendants in their petition.

The next pleading that confronts us is "a petition in trespass to try title" filed by Berta S. Chambless, Maggie Muston, joined by her husband L. A. Muston, Fannie Riley, Ruth Hendley, Sam Harrison, Mary Frizzell, joined by her husband Dee Frizzell, A. R. Thornton, W. H. Chambless, Hasseltine C. Gibson, joined by her husband H. R. Gibson, Lawson Chambless, Mack Chambless, B. M. Swann, Anna S. Chambless, Jonnie Swann, T. S. Shank, H. M. Shank, Paul J. Shank, Anna Mary Hitt, joined by her husband Clark O. Hitt, Mary S. Williamson, joined by her husband Robert L. Williamson, May S. Wilson, joined by her husband Frank Wilson, who name the said three Keltons as defendants. These many persons allege that they are the owners of an undivided one-fourth (¼) interest in the property involved in this cause. They allege that they are heirs of T. C. Swann, deceased, and that they sue "for the benefit of any and all other heirs of T. C. Swann, deceased".

All of these causes were consolidated by the trial court, and it is evident that all parties claiming any interest are necessarily "adverse parties".

We further observe that the attorney for Mary Frizzell signed the appeal bond for her, but her husband, Dee Frizzell, has not joined in making the bond.

The identical situation appears as to Hasseltine C. Gibson and her husband, H. R. Gibson, Anna Mary Hitt and her husband, Clark O. Hitt, Mary G. Williamson and her husband, Robert L. Williamson, Mary (May) C. Wilson and her husband, Frank Wilson, Maggie Muston and her husband, L. A. Muston.

■ We are not certain that all of the necessary parties to this suit have been made parties on appeal, but we pretermit this question and will consider the case for those who actually signed the appeal bond.

The parties who made the cost bond on appeal have presented three points.

■ The first point asserts that possession alone by one co-tenant is not of itself notice of an adverse claim to the other co-tenants, and since all of the parties to this suit were co-tenants, unless the appellants had actual notice that the appellees (Keltons) were claiming by limitation, their claims would not be barred.

The rule in such a suit as is before us seems contrary to appellants' stated views.

Mr. Justice Lane, speaking for the Galveston Court of Civil Appeals (in the case of Burton et al. v. Thornton et al., 67 S.W. 2d 890, 891, writ dismissed), reviews a number of the leading authorities. Quoting from Vol. 7 R. C. L.: " 'But where one cotenant occupies the common property notoriously as the sole owner, using it exclusively, improving it and taking to his own use the rents and profits, or otherwise exercising over it such acts of ownership as manifest unequivocally an intention to ignore and repudiate any right in his cotenants, such occupation or acts and claim of sole ownership will amount to a disseisin of his cotenants, and his possession will be regarded as adverse from the time they have knowledge of such acts or occupation and of the claim of exclusive ownership.' " Judge Lane next quotes from Illg v. Garcia, 92 Tex. 251, 47 S.W. 717, wherein the Supreme Court said: " 'Certainly, repudiation of the claim of a co-tenant, and notice thereof, may be shown by circumstances; and in cases like this, after all of the parties are dead, the jury may infer such facts from long-continued

possession under claim of exclusive ownership and nonassertion of claim by the other tenant';" and he next quotes from Vol. 1 R. C. L. Supplement, p. 199, wherein it is said: " 'Though it is well settled that the tenant in common out of possession must have notice of the adverse claim of his cotenant in possession, before the statute of limitation will start to run, it is settled that the latter need not give actual notice to his cotenants. Sufficient notice may result from conduct of a character such as to leave no doubt to an observer that the exclusive right of enjoyment is asserted.' "

The late Chief Justice Johnson, who has but recently gone to his reward, speaking for the Texarkana Court of Civil Appeals in the case of Seibert et al. v. Markham et al., 116 S.W.2d 501, 505, writ refused, said: "However, it was not necessary that actual notice of appellees' adverse holding and disseisin be brought home to appellants. Such notice may be constructive, and will be presumed to have been brought home to the cotenant out of possession when, as here, the adverse occupancy and claim of title is so long continued, open, notorious, exclusive, and inconsistent with the existence of any title in others, except the occupant, that the law will raise the inference of notice to the cotenant out of possession; or the jury may rightfully presume such notice." Citing Moore v. Knight, 127 Tex. 610, 94 S.W.2d 1137, and a reading of the opinion in the last cited cases discloses that Judge Johnson stated the rule exactly as same was set forth by Judge German, speaking for the Commission of Appeals.

Appellees, the Keltons, have been the sole occupants of the land since 1916. No one has ever lived on the land or used or occupied it except the Elliotts, who were living on the land when Elias Kelton and his family moved thereon, and after the death of Mrs. Elliott, her husband and all of the Elliott children left the premises, and the record discloses that none of the Elliotts, excepting a son, O. W. Elliott— one of the parties to this suit—ever went about the premises or attempted to claim or exercise any ownership over it, and we will discuss his acts later.

The Keltons rendered the property for taxes as their own and have paid all taxes thereon since 1916, and they have made improvements thereon and kept up the improvements, and cultivated, used and enjoyed the premises and kept and retained all rents and revenues and the crops and stock raised thereon and accounted to no person for same or any part thereof and have paid no rent therefor to any person save the sum of $1.00 to O. W. Elliott, which we now discuss.

In the year 1937 (evidently because of the oil play in Clay County), O. W. Elliott came to the Kelton home and finding Mrs. Eliza Kelton and Fred J. Kelton on the premises, he wrote (or his wife wrote), in duplicate, the following instrument: "A true copy of receipt filed with Mrs. Eliza Kelton September 23, 1937. Route 1, Box 24, Shannon, Texas, Sept. 28, 1937. Received by O. W. Elliott one dollar ($1.00) as rent on the said described land here in my undivided *enterest* in this part of land as recorded in Vol. 103, page 265, of the records of deeds of the said County of Clay. (Signed) Eliza Kelton, F. J. Kelton."

We observe here that F. J. Kelton testified that he signed the "1.00 receipt" to O. W. Elliott because his mother had signed it and that at that time he told O. W. Elliott he and his mother and brother Alton were claiming the land as their own by limitation.

It will be observed that this purported receipt is signed by the persons who are supposed to have paid the rent and not by the person who was supposed to be receiving it.

The jury could readily infer from the conduct of O. W. Elliott, in obtaining this written instrument, and from the fact that he had not been on the place for twenty-seven years, and the fact that he knew that the Keltons had had exclusive possession, use and control of the place since 1916, that he knew that the Keltons were holding adversely to him and the other Elliotts and all other heirs, and that his act in obtaining the signed instrument was for the purpose of showing that the Keltons were not holding adversely to him and that their possession was not hostile.

There was testimony to the effect that some other claimants knew the Keltons were claiming to be the sole owners and that they were holding adversely as against all other claimants.

There was testimony showing that some of the persons out of each group of heirs lived in various places in the State of Texas.

There was testimony showing that neighbors of the Keltons and some of their

relatives knew that the Keltons were claiming the property as theirs and as against all other persons, and that they were exercising full ownership over it.

The jury was justified in inferring from the fact that there were so many claimants, living, here, there and yonder, in the State of Texas and elsewhere, that the fact of their inheritance must have been known to them and they must have 'learned, or by the exercise of ordinary care and diligence could have known that the Keltons were and had been for these many years in exclusive possession and control of the premises and claiming and holding adversely to all other claimants.

It is interesting to note that the recorded instrument referred to in the "O. W. Elliott receipt for rent" is a deed executed in the year 1927 by P. E. Elliott, father of O. W. Elliott, C. A. Elliott and J. H. Elliott, to these three sons, purporting to convey all of the father's "undivided interest" in the land; and it is likewise interesting to consider the fact that this was not the community property of P. E. Elliott and his wife, Georgia Kelton Elliott, but that it was the separate estate of Georgia Kelton Elliott, and, at best, the only interest P. E. Elliott had in the premises, after his wife's death, was a life estate in one-third of his wife's interest.

This interest, in view of the many heirs of the first owner, in this large family, was very, very small, and P. E. Elliott must have known this and must have taken this into consideration when he moved from the place, after his wife died.

The jury had the right "to think on these things" and to draw inferences therefrom, in the light of O. W. Elliott's acts, and the fact that he seemed to be claiming under his father's deed, but waited ten years, after the execution of the deed, before he went about, took any interest in or showed any disposition to claim any right to same, when, during all these years, he knew that the Keltons had exclusive ownership and control thereof.

The charge of the trial court followed the approved language found in the opinion written by Mr. Justice McClendon for the Commission of Appeals, in the case of Stiles et al. v. Hawkins et al., 207 S.W. 89, see page 95.

No complaint is made of the charge of the court in the instant suit.

We overrule the first point.

The second point asserts that where possession of land is by consent of those jointly owning same, being co-tenants, then the one in possession cannot claim the title, under limitation, for the reason that the possession of the land in question was by agreement.

In the first place, the evidence fails to show without dispute that the Keltons held possession by mere consent of all of the other claimants and co-tenants.

The evidence tends to show the contrary and the jury so found.

We overrule the contention.

The third point we quote: "The answer of the jury to the issues cannot be the basis of any judgment where there is no testimony either warranting the submission of the issues to the jury or the jury's finding on the issues submitted to them without any evidence whatever to support said verdict, and the court erred in not rendering judgment for the appellants and against the appellees for the reason that there was no testimony to support the ten year statute of limitations."

In the light of the authorities cited and quoted from, and with the record before us, we overrule the point.

The judgment is affirmed.